CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 0 8 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| CASSIE V. MORTON, | ) | |
| | ) | Civil Action No. 1:14CV00047 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | Hon. Glen E. Conrad |
| SHEARER'S FOODS, LLC, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

Cassie V. Morton filed this action against her former employer, Shearer's Foods, LLC ("Shearer's"), alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The case is presently before the court on the defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

## Factual Background

The following facts are either undisputed or, where disputed, are presented in the light most favorable to the plaintiff. See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (emphasizing that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party).

On May 13, 2009, Shearer's hired Morton to work as a packer at its snack food manufacturing facility in Bristol, Virginia. In that position, Morton was responsible for retrieving bags of potato chips from a conveyor belt, packing the bags into boxes, and stacking the boxes on a wooden pallet. Morton was also required to randomly check the product name, expiration date, and other information on the potato chip bags to ensure that the information was correct and legible.

In June of 2011, Morton applied to work as a quality control lab technician in the Bristol facility's quality assurance department. Morton was awarded the position shortly after her interview, and she began working in the lab in August of 2011. In the new position, Morton reported to Brandi Owens and Edward Learoyd.

As a quality control lab technician, Morton was primarily responsible for monitoring the production process to ensure compliance with the company's food safety and quality standards. Her responsibilities included conducting metal, oil, moisture, salt, seasoning, and breakage tests, and shutting down the production line if any product failed to meet certain specifications. In addition, Morton was tasked with ensuring that equipment was calibrated and running properly, and with maintaining accurate records of her efforts.

Morton received intensive training for the new position. This included working for one week with someone "literally by [her] side," followed by an additional month of working with "a lead constantly checking on [her]." Morton Dep. at 38. After the initial training period, Morton and other lab technicians received frequent instruction on the company's food safety rules and procedures.

Of all of the safety functions Morton performed, metal detection testing was one of the most important. See id. at 46 (acknowledging that metal tests were "a big deal"). When Morton first began working as a quality control lab technician, she was responsible for conducting metal detection tests every two hours. To conduct these tests, Morton would insert three metal wands or cards into a potato chip bagger, one at a time, to ensure that the machine actually turned off to alert the operator that there was a foreign object in the bag. After each successful "trip," Morton would restart the machine and begin the process over again with another metal wand or card. Id. at 49-50, 58-61. If the bagger tripped all three metal wands or cards, Morton would record the

2

successful test on the metal detection trip log, along with her initials. By initialing the trip log, Morton verified that no abnormalities had occurred in the metal detection process. If a metal detection test failed, Morton was required to record the deviation on a red piece of paper, explain the problem, and place all affected products on hold. At the end of each shift, a quality control lead or supervisor would review Morton's logs to confirm that the metal detection tests had been done correctly and that no deviations had occurred, and add his or her initials to the log.

In June of 2013, the metal detection procedures were changed so that either the packing machine operator or the quality control lead was responsible for conducting the metal detection tests every two hours. However, there were times when Morton, as a lab technician, was tasked with double checking the accuracy of the trip logs when the quality assurance lead, supervisor, or manager was unavailable to verify that the metal detection procedures had been followed.

During Morton's term of employment with Shearer's, the company maintained a corrective action policy, which provided for progressive discipline based on the particular circumstances of each employee's infraction. On August 18, 2011, a few months after Morton began working as a quality control lab technician, she received the second of several written reprimands issued pursuant to the policy.[1] According to the corrective action form, Morton was reprimanded for failing to ensure that the correct seasoning flavors were used in the production process. Her supervisor, Brandi Owens, noted that "722 cases of product were produced with the incorrect seasoning," and that "[t]he cost of lost product, film and the associate wages to discard was approximately $9500." Def.'s Ex. H. Morton was advised that "unless this problem is corrected, further corrective action will be taken, up to and including the termination of your employment." Id.

---

[1] Morton received her first written reprimand on January 3, 2011, while she was still working as packer, for failing to detect errors with product expiration dates on three separate occasions.

3

On September 20, 2011, Morton received "verbal counseling" for failing to ensure that the hole punch machine made a complete hole punch through bags of a product that were to be hung in stores. Morton's supervisor noted that this omission "resulted in significant additional financial repercussions to correct." Def.'s Ex. I.

On January 15, 2013, Morton was disciplined for her "[r]epeated failure to immediately react to out of specification product as tested, trained and detailed in the Quality Decision trees." Def.'s Ex. J. Morton's supervisor noted that "[t]his jeopardized additional product and could have resulted in unnecessary and significant costs for the business," and that Morton may be terminated if the problem persisted. Id.

On March 12, 2013, Morton received a "final warning" for "[r]eleasing a machine for production without properly verifying the correct sanitation and incorrectly completing the Allergen Change Up Form resulting in the loss of approximately $7,500 of finished material goods." Def.'s Ex. K. Morton was advised that food safety is of "utmost concern at all times," and that she should "not rush any tasks related to food safety." Id. Morton was further advised that her employment may be terminated if the problem was not corrected.

Between March 12, 2013 and her July 12, 2013 termination, Morton received two additional reprimands for conduct unrelated to food safety or quality control. On April 22, 2013, Morton received a written warning for taking an excessive number of breaks that exceeded the allotted time. On May 16, 2013, Morton was counseled on the company's "Culture of Respect," following an incident with a coworker. Def.'s Ex. M.

On Wednesday, July 10, 2013, Morton began a twelve-hour shift at 3:00 p.m. Shortly after midnight, on July 11, 2013, Greg McDavid, a production supervisor, asked Morton to verify the metal detection trip logs for each of the sixteen packaging machines. At that time, the quality

4

assurance manager, Edward Learoyd; the supervisor, Paul Nicely; and the lead technician were all either off work or unavailable to verify the trip logs. Morton had conducted metal detection tests in the past and was familiar with the process. See Morton Dep. at (acknowledging that she was qualified to verify the metal detection trip logs). Thus, when Morton reminded McDavid that she was not a lead, McDavid told her to "[g]o ahead and [check the trip logs] anyway." Id. at 126.

During her deposition, Morton testified that she checked each of the metal detection trip logs to make sure that the tests had been performed correctly during the shift and that no deviations had occurred. Morton then initialed each trip log, including the log for Packaging Machine #5, confirming that no deviations had occurred and that "everything was the way it was supposed to be." Id. at 126.

According to the defendant's documentary evidence, however, Morton missed a test deviation. The metal detector trip log for Packaging Machine #5, which contains Morton's initials, indicates that the test conducted at 9:40 p.m. tripped only two of the three metal cards. Def.'s Ex. N. This meant that the machine did not sense one of the three metal cards, and that it possibly allowed other foreign objects to pass through the production process.

At approximately 8:00 a.m. on Thursday, July 11, 2013, Nicely informed Learoyd that Morton had missed the failed metal detection test on Packaging Machine #5 when she initialed the trip log. Learoyd subsequently completed a corrective action form on which he noted that Morton had "[a]cknowledg[ed] HACCP [Hazard Critical Control Point] line records without properly verifying that testing and functionality were within food safety compliance guidelines." Def.'s Ex. N.

On the afternoon of July 11, 2013, following a doctor's appointment, Morton returned to Shearer's and informed Anna Robertson, the human resources manager, that she needed time off

5

to undergo a series of medical tests and, ultimately, a hysterectomy. Robertson provided Morton with FMLA and short-term disability forms to be completed by her healthcare providers.

Shortly thereafter, Learoyd went to Robertson's office and informed Robertson that Morton had signed off on a failed metal detection test during her last shift. Learoyd explained the seriousness of the incident, and noted that the next step in the corrective action policy's progressive discipline process was termination, since Morton had already received a final warning. At that point, Robertson informed Learoyd that Morton had just requested FMLA paperwork, and that the company may have to wait until Morton returned from medical leave to terminate her. Robertson advised Learoyd that she would speak with the plant manager and human resources employees at the corporate office to determine how to handle the situation.

On Friday, July 12, 2013, Robertson contacted Walt Fink, the vice president of human resources, to discuss whether Shearer's could terminate Morton for a policy violation that had occurred earlier in the week. Robertson informed Fink of the nature of the violation, and advised him that Morton was on final warning status at the time of the incident. Robertson also indicated that Morton had subsequently requested FMLA leave, and that she was concerned that the leave request would preclude Shearer's from immediately terminating Morton's employment.

Fink advised Robertson that he was of the opinion that termination was warranted under the corrective action policy. However, in light of Morton's request for FMLA leave, Fink deferred a final decision on the matter until the following week.

Fink spoke to Robertson again on Monday, July 13, 2013. At that time, Fink approved the decision to terminate Morton immediately, without waiting for her to return from FMLA leave. Shortly thereafter, Robertson and Learoyd contacted Morton by telephone and advised her that she

6

was being terminated, and that the effective date of the termination would be July 12, 2013, the day after the incident involving the failed metal detection test.

Shearer's maintains a group health insurance plan through Anthem Blue Cross & Blue Shield ("Anthem"). Section 7 of the plan's benefit booklet provides that a participant's coverage terminates on the participant's "date of termination." Fink Aff. Ex. at SFI 00316. Likewise, Section 8, titled "Changes in Coverage: Termination, Continuation & Conversion," provides that "your coverage generally will terminate on your date of termination." Id.

Following Morton's termination, Shearer's informed Anthem by automatic/electronic notification that Morton was no longer employed by Shearer's as of July 12, 2013. On August 1, 2013, Anthem notified Morton that her group healthcare coverage had terminated effective July 12, 2013, but that she had the right to continue her benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). To continue her individual coverage, Morton was required to notify Anthem and make a monthly premium payment of $330.69. Morton ultimately elected not to continue coverage beyond the termination of her employment.

## **Procedural History**

Morton, by counsel, filed the instant action against Shearer's on July 14, 2014. The complaint alleges that Shearer's violated the FMLA by terminating her in retaliation for requesting FMLA leave, and that Shearer's violated ERISA by terminating her health insurance benefits.

On June 19, 2015, Shearer's moved for summary judgment. After the motion was filed, Morton's counsel moved to withdraw from representing her. The court denied the motion to withdraw until such time as new counsel made an appearance on Morton's behalf or Morton indicated that she intended to proceed without the assistance of counsel.

7

Thereafter, counsel filed on Morton's behalf a motion to stay further proceedings until Morton had the opportunity to retain a new attorney. The court granted the motion in part, and set a July 21, 2015 deadline for Morton to advise as to whether she had retained substitute counsel or had decided to proceed pro se.

On August 6, 2015, after no attorney had made an appearance on Morton's behalf, the court entered an order directing Morton to file any affidavits or other evidence in response to the pending summary judgment motion by August 19, 2015. Morton subsequently requested and received two extensions of time in which to respond to the motion.

The court held a hearing on the summary judgment motion on August 24, 2015, at which Morton appeared pro se.[2] The motion for summary judgment is now ripe for disposition.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Tolan, 134 S. Ct. at 1866. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

[2] During the hearing, the court granted counsel's motion to withdraw from representing Morton.

8

(1986). "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

## Discussion

### I. FMLA Claim

Morton first claims that Shearer's violated the FMLA by terminating her in retaliation for requesting medical leave. See 29 U.S.C. § 2615(a); see also 29 C.F.R. § 825.220(c) ("The [FMLA's] prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights.").

"FMLA retaliation claims are analogous to discrimination claims brought under Title VII [of the Civil Rights Act of 1964]." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013). Accordingly, in the absence of direct evidence to support a claim of retaliation, the plaintiff's claim is evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See id. Under this framework, the plaintiff "must first make a prima facie showing that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." Yashenko v. Harrah's N.C. Casino Co., 446 F.3d 541, 551 (4th Cir. 2006) (internal citation and quotation marks omitted). If the plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation, and the employer offers a nonretaliatory reason for the adverse action, the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." Id. (internal citation and quotation marks omitted).

9

In this case, even assuming that Morton could satisfy every element of the prima facie case, Shearer's has articulated a legitimate, nonretaliatory reason for terminating her employment. Specifically, Shearer's maintains that Morton's employment was terminated because she committed a safety infraction by improperly verifying a failed metal detection test. Shearer's has provided a copy of Morton's disciplinary records and the company's corrective action policy, which indicate that Morton was on final warning status for food safety issues at the time of the incident, and that the next step of the corrective action process was termination. Accordingly, the court finds that Shearer's has met its burden of demonstrating a legitimate, nonretaliatory reason for Morton's termination. See Odom v. Int'l Paper Co., 652 F. Supp. 2d 671, 691 (E.D. Va. 2009) (holding that the employer met its burden of establishing a legitimate, nondiscriminatory reason for the plaintiff's termination by producing evidence that, "after having prior rule violations, [plaintiff] again violated the . . . safety policy"); see also Gray v. Masterfoods USA, 304 F. App'x 611, 612 (9th Cir. 2008) (noting that the employer "had a legitimate, non-discriminatory reason for terminating [the plaintiff], because he failed to follow the company's 'lock out/tag out' safety procedure").

Having reached this decision, Morton bears the burden of establishing at step three of the McDonnell Douglas framework that the company's asserted reason for her termination is "pretext for FMLA retaliation." Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001). For the following reasons, the court concludes that Morton has not met this burden.

In assessing whether an employer's proffered reason is pretextual, "it is the perception of the decisionmaker which is relevant." Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007). When an employer articulates a legitimate, nondiscriminatory basis for terminating an employee, the court does not "decide whether the reason [for termination of

10

employment] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the decision]." Laing, 703 F.3d at 722 (internal citation and quotation marks omitted); see also Gibson v. Fluor Daniel Servs. Corp., 281 Fed. App'x 177, 179 (4th Cir. N.C. 2008) (emphasizing that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct') (quoting Damon v. Fleming Supermarkets, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999)).

In the instant case, Morton has presented no evidence from which a reasonable jury could find that Edward Learoyd, Anna Robertson, Walt Fink, or any other company official responsible for terminating her employment, did not honestly believe that she had improperly verified a failed metal detection test, or that such conduct warranted termination in light of her disciplinary history. Although Morton claims that "everything was legit . . . when [she] looked at the metal detector counter that night," Morton Dep. at 130, the metal detector trip log for Packaging Machine #5, which contains Morton's initials, indicates that a deviation did, in fact, occur. Moreover, it is undisputed that Morton was on final warning status for food safety issues at the time of the incident, and that the next step in the corrective action process was termination. While Morton obviously disagrees with the company's decision to terminate her employment, such disagreement does not prove that the asserted reason for the decision "was dishonest or not the real reason for her termination, which is what is required at step three of the burden-shifting framework." Laing, 703 F.3d at 722.

Additionally, Morton has failed to identify any similarly situated employee who was treated differently by Shearer's. See id. at 719 (noting that federal courts "routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive"). To the contrary, the record reveals that, since January of 2013,

11

Shearer's has disciplined at least six other employees at the Bristol facility for food safety issues, including the failure to follow the company's metal detection procedures. Indeed, Latosha Winders, the employee who conducted the failed metal detection test on Packaging Machine #5 at 9:40 p.m. on July 10, 2013, was also disciplined for failing to follow established standard operating procedures.[3]

Finally, the court notes that the mere fact that Morton was terminated a few days after requesting FMLA leave is insufficient to create a genuine issue of material fact as to the reason for her termination. While timing can be considered in assessing whether an employer's explanation is pretextual, "it is not usually independently sufficient to create a triable issue of fact." Mercer v. The Arc of Prince Georges County, Inc., 532 F. App'x 392, 399 (4th Cir. 2013); see also Laing, 703 F.3d at 720 (holding that the close temporal proximity between the plaintiff's use of FMLA leave and her termination was sufficient to establish the causal nexus required at step one of the McDonnell Douglas framework, but that the plaintiff's evidence was insufficient to support a reasonable jury finding of pretext).

For all of these reasons, the court concludes that Morton's evidence fails to create a genuine issue of material fact as to whether Shearer's terminated her employment for requesting FMLA leave. Accordingly, the motion for summary judgment will be granted with respect to this claim.

## II. ERISA Claim

Morton also asserts a claim for breach of fiduciary duty under ERISA based on the termination of her healthcare benefits. In enacting ERISA, Congress created a private right of action under which plan participants may sue in order to enforce fiduciary obligations. See 29

---

[3] Unlike Morton, however, Winders was not on final warning status at the time of the incident. Consequently, the infraction did not result in the termination of Winders' employment.

U.S.C. § 1132(a). "In order to establish a breach of fiduciary duty claim and, therefore, survive summary judgment, [a plaintiff] must show that the [defendant] was a fiduciary under ERISA, that it breached its fiduciary duties and that [the plaintiff] is entitled to relief." Graham v. Pactiv Corp. Benefits Comm., 301 F. Supp. 2d 483, 498 (E.D. Va. 2004). For the following reasons, the court concludes that Morton's claim fails at the first element.

"Before one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of 'fiduciary.'" Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 60-61 (4th Cir. 1992). Under the applicable statutory provision, a "fiduciary" is defined as a person or entity that (1) "exercises any discretionary authority or discretionary control respecting management of such plan or . . . its assets," (2) "renders investment advice for a fee or other compensation," or (3) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(a); see also Pender v. Bank of Am. Corp., 788 F.3d 354, 362 (4th Cir. 2015) (setting forth the "three capacities" in which a defendant can be a fiduciary for purposes of ERISA). In summarizing this definition, the United States Court of Appeals for the Fourth Circuit has observed that an ERISA fiduciary is "any individual who de facto performs specified discretionary functions with respect to the management, assets, or administration of a plan." Custer v. Sweeney, 89 F.3d 1156, 1161 (4th Cir. 1996).

In this case, Morton has not identified any evidence suggesting that Shearer's had discretionary control or authority over the health insurance plan offered to her and other employees. Instead, the record reveals that Anthem had "complete discretion" to interpret the plan and determine all questions arising under it, and that the defendant's involvement was limited to ministerial functions, such as informing associates about available benefits, collecting funds as

13

provided in the plan via payroll deductions, and maintaining employment-related records. See Fink Aff. ¶ 15; Fink Aff. Ex. at SFI 000349. The court agrees with Shearer's that such functions are insufficient to give rise to a fiduciary duty under ERISA. See Moon v. BWX Techs., Inc., 577 F. App'x 224, 231 (collecting contributions, preparing reports, and processing claims are "administrative" or "ministerial" functions which are not considered discretionary) (citing 29 C.F.R. § 2509.75-8). Accordingly, Shearer's is entitled to summary judgment on this claim.[4]

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

ENTER: This 8th day of September, 2015.

*[signature]*
Chief United States District Judge

---

[4] The court also notes that the plain terms of the group health plan allowed Morton to participate only while she was actively employed by Shearer's, and that there is no evidence that Shearer's had any authority to extend her benefits past her termination date. Although Morton could have paid for continued coverage under COBRA, she elected not to do so.

14